# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| BRIAN KAINOA MAKOA MCKNIGHT SR., <br><br> Plaintiff, <br><br> v. <br><br> JULIE MCKNIGHT; BRIAN KELLY MCKNIGHT; MARC LAMONT HILL; <br><br> JOHN DOES 1–20; NYP HOLDINGS, INC., d.b.a. New York Post; LATASHA TRANSRINA KEBE and LIMITED LIABILITY COMPANIES 1-20; <br><br> Defendants. | Civil Action No.: <br><br><br> **PLAINTIFF'S COMPLAINT & DEMAND FOR JURY TRIAL** |

Plaintiff, Brian Kainoa Makoa McKnight Sr. ("Plaintiff" or "Mr. McKnight"), by and through his undersigned counsel, hereby files this Complaint against Defendants Julie McKnight, Brian Kelly McKnight, Marc Lamont Hill, and NYP Holdings, Inc., d.b.a. New York Post, Latasha Transrina Kebe, as well as the yet to be determined individuals and entities, and alleges as follows:

## PRELIMINARY STATEMENT

1. This case arises from a coordinated reputational assault designed to leverage defamatory statements made about and against a world-renowned, Georgia based recording artist for the purpose of profiting from malicious character assassination.

2. In shockingly dishonest and malicious attacks, the Defendants have sought to create a sensational but false narrative concerning Plaintiff Brian Kainoa Makoa McKnight Sr. – a narrative callously rooted in and taking advantage of the tragic death of Mr. McKnight's son, Niko.

3. The false narrative peddled and published by Defendants has caused catastrophic harm to Mr. McKnight, his reputation, his career, and his family.

4. Though Plaintiff would prefer to live in peace and abstain from a legal battle, Defendants' relentless and persistent assault upon his character has left him with no alternative but to seek the vindication that only comes from the truth.

5. Therefore, Plaintiff brings this action to hold Defendants accountable for intentionally publishing and profiting from their false narratives, which have grotesquely sought to convert a tragic family death into a revenue stream.

## PARTIES, JURISDICTION & VENUE

6. Plaintiff Brian Kainoa Makoa McKnight Sr. is a longtime resident and citizen of the State of Georgia who maintains his professional base and business operations in this District.

7. Upon information and belief, Defendant Julie McKnight is a citizen and resident of the State of North Carolina. Defendant Julie McKnight is Plaintiff's former spouse and is the mother of Defendant Brian Kelly McKnight.

8. Upon information and belief, Defendant Brian Kelly McKnight is a citizen and resident of the State of California.

9. Upon information and belief, Defendant Marc Lamont Hill is a citizen and resident of the State of Pennsylvania.

10. Upon information and belief, Defendant NYP Holdings, Inc., d.b.a. New York Post is a unit of News Corp., with its principal place of business in New York, New York. NYP Holdings owns and operates Page Six, a media publication and entertainment news platform. New York Post Page Six (or "Page Six") regularly publishes entertainment news articles and related content through its website, social media accounts, and affiliated digital platforms, which are accessible nationwide, including in the State of Georgia.

11. Upon information and belief, Defendant Latasha Transrina Kebe is a citizen and resident of the State of Florida.

12. John Does 1–20 and Limited Liability Companies 1-20 represent presently unknown individuals and entities – including media outlets, production companies, and social-media administrators - who participated in the planning, publication, or republication of the defamatory statements or other false statements. Their true names and capacities will be added when ascertained.

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and all known Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

14. This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and the Georgia Long-Arm Statute, O.C.G.A. § 9-10-91(3). Defendants intentionally directed defamatory publications and related promotional content toward Plaintiff, a Georgia resident, with knowledge that the statements would cause reputational, emotional, and economic harm within this State. By committing tortious acts outside Georgia that were expressly aimed at a Georgia resident and that caused injury within Georgia, Defendants are subject to personal jurisdiction in this Court.

15. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to these claims occurred in Georgia and Plaintiff resides here.

16. All jurisdictional prerequisites have been satisfied.

## STATEMENT OF FACTS

### Plaintiff's Early Life and Musical Foundations

17. Plaintiff Brian Kainoa Makoa McKnight Sr. ("Plaintiff" or "Mr. McKnight") is an internationally recognized recording artist, songwriter, and performer whose career spans more than three decades and includes multiple Grammy nominations, platinum albums, and worldwide performances celebrating themes of love and family.

18. His reputation, both personal and professional, is inseparable from those themes.

19. Plaintiff was born and raised in Buffalo, New York, where music and faith shaped his earliest experiences. From childhood he studied piano, wrote original compositions, and performed in church choirs – conduct that later defined his professional identity.

20. By his late teens, Plaintiff was writing, recording, and producing original works, and securing early recording opportunities that established him as a promising new R&B artist.

21. His first major label album, *Brian McKnight* (1992), earned critical attention, national airplay, and immediate recognition for sincerity of tone and lyrical focus on love and family – themes that became central to his brand and professional goodwill.

22. Over the next three decades, Plaintiff released numerous gold and platinum records, collaborated with award-winning artists, and performed worldwide.

23. Plaintiff's name and likeness have become inseparable from values of integrity, romance, and emotional authenticity.

24. Plaintiff's reputation for authenticity and compassion is repeatedly cited in interviews, televised appearances, and fan communications, demonstrating the breadth of Plaintiff's reputational reach and recognition.

## Industry Reputation and Public Goodwill

25. Over a career spanning more than thirty years, Plaintiff has earned professional admiration from prominent musicians, producers, and industry executives for his musicianship, work ethic, and consistent adherence to themes of love, family, and integrity in his music and public appearances.

26. Plaintiff has been nominated for 17 Grammy Awards, as well as multiple nominations for American Music Awards and Soul Train Awards.

27. He has hosted televised charity events and received commendations for community service and mentorship programs for young artists.

28. Plaintiff was awarded the NAACP Image Award by the National Association for the Advancement of Colored People – an award that honors outstanding performances in film, television, theater, music, and literature. Other notable recipients of the NAACP Image Award include similar global public figures in

music such as Michael Jackson, Stevie Wonder, Luther Vandross, Prince, Lionel Richie, LL Cool J, Usher, and more.

29. These acknowledgements are matters of public record that confirm Plaintiff's sustained positive reputation in the music industry.

30. Plaintiff's artistic identity is commonly associated with honest and raw emotional sincerity and devotion to romantic authenticity, and personal vulnerability – qualities integral to his goodwill and commercial and moral standing.

31. Plaintiff has served as a spokesperson and brand ambassador for television specials and charitable campaigns, including scholarship initiatives and anti-violence efforts.

32. Over the course of his career, Plaintiff has established and maintained strong relationships with other professionals in the music industry and with his audience, all of which contributed to his commercial success and goodwill.

**Plaintiff's Familial Relationship with Defendants Julie McKnight and Brian Kelly McKnight**

33. Plaintiff and Defendant Julie McKnight were married in 1989.

34. Defendant Brian Kelly McKnight (herein, "BK McKnight") is the son of Plaintiff and Defendant Julie McKnight.

35. Plaintiff and Defendant Julie McKnight had a second son, Cole Nikolas ("Niko") McKnight who was born on October 16, 1992.

36. The marriage between Plaintiff and Defendant Julie McKnight ultimately ended in divorce in 2003.

37. Throughout the course of the marriage and in the years following their separation, Plaintiff maintained contact with his children and continued to participate in family and creative activities involving them.

38. Following the dissolution of their marriage, Plaintiff and Defendant Julie McKnight continued to address family matters concerning their children privately.

39. However, at certain times, disagreements would arise between Plaintiff and Defendant Julie McKnight. Relevant to this matter is a dispute that arose in or around 2014, which resulted in a written settlement agreement.

**The 2014 Settlement Agreement between Plaintiff and**

**Defendant Julie McKnight and the Non-Disparagement Obligations**

40. Following their divorce, disputes arose between Plaintiff and Defendant Julie McKnight that culminated in a formal written settlement agreement. On or about August 30, 2014, Plaintiff and Defendant Julie McKnight entered into a written contract, specifically a Settlement Agreement and Release (2014 Agreement) which resolved certain disputes then existing between Plaintiff and Defendant Julie McKnight.

41. The 2014 Agreement contains specific provisions prohibiting the disparagement of each of the parties thereto by the other party. Specifically, the 2014 Agreement provides, in relevant part:

> The Parties agree not to disparage, denigrate, discredit, or make negative comments about one another, or to encourage or induce others to do so, in any communications with third parties (including all forms of media) in any manner that has a natural tendency to injure the Parties or their business, business reputation, or personal reputation.

42. Over time, however, Defendant Julie McKnight began making public statements concerning Plaintiff, their former relationship, and Plaintiff's relationship with their children.

43. Such statements, many of which were defamatory in their own right, disparaged, denigrated, discredited and otherwise reflected negatively upon Plaintiff, in violation of the terms of the 2014 Agreement.

**Plaintiff's Re-Marriage in 2017, & An Initial False Accusation by Defendant BK McKnight in 2019 that Continues to Spread Like a Wildfire**

44. In 2014, Mr. McKnight and Leilani Malia Mendoza ("Mrs. McKnight" or "Leilani McKnight"), began dating. They announced their engagement in May 2017 and were married later that year – seeking to create a unified family environment that included not only his wife but also the children connected to both of their families.

45. At the time of Plaintiff's marriage, his sons – including Defendant BK McKnight and Niko McKnight – maintained a positive relationship with Plaintiff and were present during the wedding celebrations.

46. Plaintiff's sons played a central role in the ceremony and celebrations surrounding the marriage. They participated in the wedding events and publicly expressed support for the union, celebrating the joining of the families and the creation of a new household.

47. During those celebrations, members of the family including Plaintiff's sons raised a toast acknowledging the marriage and welcoming the blending of their families. The tone of the event was one of unity, optimism, and happiness regarding the future of the newly formed family.

48. Between approximately 2017 and August 2019, Plaintiff maintained an active and ongoing relationship with his sons, Niko McKnight and Defendant BK McKnight. During that time, Plaintiff collaborated with them musically, continued communicating and even appeared publicly alongside them.



49. But in or around August 2019, Defendant BK McKnight and Niko had become estranged from Plaintiff after personal family disagreements that had previously remained private began to surface publicly on social media and digital media platforms. During this time, statements began circulating online – some made directly and others conveyed through implication – that portrayed Plaintiff Brian McKnight Sr. as a father who had rejected and abandoned his children.

50. The initial defamatory narrative at issue in this case – as well as Defendant BK McKnight's or Niko's estrangement from their father – did not arise suddenly. Rather, it stems from a false statement first publicly circulated in or around August 2019 by Defendant BK McKnight.

51. In that statement, **Defendant BK McKnight communicated that Plaintiff had abandoned his children, declaring words to the effect of: "I can't imagine abandoning my children, man."**



52. That statement and all implications that Plaintiff had abandoned his children was false. It was posted publicly on social media, preserved and archived online, and

never corrected or retracted. The accusation is also directly contradicted and disproven by years of documented interaction between Plaintiff and his sons, including musical collaborations, public appearances, and ongoing personal and professional communication over many years.

53. Despite its falsity, the statement became the foundation of a broader narrative portraying Plaintiff as a father who had abandoned or rejected his children – a narrative that clearly and deliberately sought to obscure the fact that the disagreements between Plaintiffs and his sons occurred after the latter were adults, as opposed to estrangement between minor children and their father. Once published, the accusation was repeatedly cited and referenced by others online as supposed evidence of Plaintiff's character and conduct.

54. From approximately August 2019 through 2025, that original false statement was repeated, distorted, and republished.

55. Through this process, a single false statement evolved into a sustained and expanding online narrative portraying Plaintiff as a father who had rejected his children – an accusation that Defendants later repeated and amplified through interviews, social media posts, and media publications described throughout this Complaint.

56. The  narrative quickly spread beyond Defendant BK McKnight.

57. Throughout 2020 and 2021, the online narrative intensified.

58. Posts, commentary, and discussions referencing those accusations appeared across multiple online channels, including social-media platforms, podcasts, entertainment blogs, and digital tabloids. As the statements circulated, they evolved into a broader public narrative portraying Plaintiff as a father who had willfully distanced himself from his family. But the opposite was true – by this time, Defendant BK McKnight and his brother, Niko McKnight, had become estranged from Plaintiff after Defendant BK McKnight had falsely portrayed Plaintiff as a father who had rejected and abandoned his children.

**The Ongoing False Narratives & Online Attacks Against Plaintiff and Mrs. Leilani McKnight After the Loss of their Infant Son in 2021**

59. In 2021, Plaintiff and his wife suffered the devastating loss of their infant son. The response to this event is indicative of the harm and hatred that had been created by Defendant BK McKnight's repeated false allegations. Rather than responding with compassion, online commentators seized upon the tragedy and used the already circulating false narrative that Plaintiff had "abandoned" his children to justify further attacks. Online posts appeared describing the loss as "karma" or "punishment," grotesquely celebrating the family's grief while repeating and reinforcing the defamatory accusations against Plaintiff. These attacks inflicted additional emotional harm on Plaintiff and his family in a time

of profound mourning and demonstrate how the false narrative had fueled a sustained and hostile campaign of online abuse.

60. Individual content creators, commentators, and entertainment media platforms began repeating and amplifying the allegations, in some instances generating revenue through advertising, viewership, and other forms of digital monetization tied to the controversy.

61. Each repetition of these allegations exposed the accusations to larger audiences and intensified the public harassment directed toward Plaintiff and his family. Online commentary frequently presented speculation and unverified claims as fact, blurring the line between personal opinion and factual accusation.

62. During this period, when clarifying information or contrary evidence was presented online contradicting the accusations, those same platforms rarely corrected or contextualized their earlier statements. Instead, the original accusations continued circulating without meaningful correction.

63. In May 2022, Plaintiff shared a Mother's Day message on his social-media account expressing appreciation for his wife, Mrs. McKnight, and acknowledging her role as a mother to the children in their household. In the post, Plaintiff shared a photograph of himself with his wife and her children and wrote a message recognizing her strength and devotion as a mother.

64. In that message, Plaintiff reflected on a deeply personal family tragedy: the loss of the couple's infant son, Kekoa Matteo McKnight. Plaintiff explained that the photograph had been taken shortly before the anticipated birth of their son and that the date of the post coincided with what had been expected to be Kekoa's due date.

65. Plaintiff's message described the grief he and his wife continued to experience following the loss of their child and expressed admiration for the strength his wife demonstrated during that difficult period. Plaintiff wrote that witnessing her endure the loss of their son with courage and resilience had left him in awe.

66. Despite the personal and reflective nature of the message – which was intended as a tribute to motherhood and as an acknowledgment of the loss the family had endured – the post was quickly taken out of context.

67. By 2023 and 2024, Defendant BK McKnight's earlier narratives and accusations of abandonment (which had started with "I can't imagine abandoning my children, man") had resurfaced again in connection with new, painful, and emotionally significant developments in Plaintiff's personal and family life, including Plaintiff's son Niko's diagnosis with cancer.

68. The republication of these outdated and untruthful accusations reignited the cycle of online hostility and renewed public discussion of the false narrative portraying Plaintiff as a father who had abandoned his children.

69. Throughout this period, Plaintiff continued to focus on his family, his health, and his professional work as an artist and performer. Nevertheless, the recurring resurfacing of these online accusations repeatedly disrupted those efforts and subjected Plaintiff and his family to renewed waves of online harassment and emotional distress.

70. The impact of these repeated online narratives extended beyond reputational harm. Members of Plaintiff's family, including his spouse, were subjected to targeted online attacks and harassment directly tied to the false accusations circulating about Plaintiff.

71. The persistence and repetition of these accusations across digital platforms created an environment in which false claims about Plaintiff could be revived and amplified whenever Plaintiff appeared publicly, released new music, participated in interviews, or shared personal updates online.

**Defendants' Coordinated and Escalated Defamatory Campaign**

**Against Plaintiff in A Second Time of Grief**

72. In or around January 2024, Niko McKnight, Plaintiff and Defendant Julie McKnight's son, publicly disclosed that he had been diagnosed with cancer. After revealing the diagnosis, Niko documented portions of his medical journey through social media and other public communications, sharing updates about his

treatment and the physical and emotional challenges he faced during his battle with the disease.

73. Upon information and belief, after Niko's diagnosis and during his battle with cancer, Defendant Julie McKnight was actively working on authoring and promoting her memoir entitled *Mama Bear: Beautifully Blended*, which was published in or around January 2025, and contained numerous statements concerning Plaintiff and his family relationships. In that publication, Defendant Julie McKnight portrayed Plaintiff as an abusive husband and neglectful father, advancing a narrative that Plaintiff had mistreated his family and failed his children.

74. After the book was published, in or around May 8, 2025, Plaintiff filed a defamation action arising from statements contained in that publication, asserting that the book included numerous false and defamatory claims concerning Plaintiff's conduct as both a husband and father. At the time that Plaintiff had filed that defamation action, Plaintiff was unaware that Niko was still suffering, as Defendant Julie McKnight had only a few months prior stated that Niko was healing from cancer while on a broadcast of a recorded interview with FOXY/WFXC/K 107.1/104.3 from its Raleigh, North Carolina studio.

75. Thereafter, on May 29, 2025 – only months after Defendant Julie McKnight published the book – Niko McKnight, the 32-year-old son of Plaintiff and

Defendant Julie McKnight, passed away following a near two-year battle with cancer.

76. During the litigation, Defendant Julie McKnight failed to appear and respond as required by the court, forcing Plaintiff to seek a default judgment. On July 17, 2025, the court entered default against Defendant Julie McKnight. On or around August 5, 2025, a motion for default judgment was filed with the court and the court set a hearing on September 15, 2025.

77. The following month, in or around October 16, 2025, Plaintiff was informed that the default judgment against Defendant Julie McKnight was granted. Plaintiff publicly addressed the entry of default against Defendant Julie McKnight through a video message posted to his social-media account on Instagram. In that message, Plaintiff stated that the court proceedings had resulted in a ruling awarding damages of approximately $8.8 million arising from the defamatory statements contained in Defendant Julie McKnight's book.

78. In the video, Plaintiff explained that the litigation concerned Defendant Julie McKnight's efforts to damage his reputation and harm his family through the publication of false accusations, stating: "According to the courts, trying to ruin my name and bring harm to my family in a book filled with lies equals $8.8 million dollars."

79. News outlets and social-media commentators began discussing Plaintiff's statement and the underlying litigation shortly thereafter, further increasing public attention on the dispute between Defendant Julie McKnight and Plaintiff.

80. Defendant BK McKnight then publicly responded to Plaintiff's statement through a video posted online.

81. According to the St. Louis American Newspaper, Defendant BK McKnight posted a video responding to Plaintiff, stating that Plaintiff is a "hurt, a very emotionally unavailable and not intelligent person."[1]

82. Defendant BK McKnight further referenced deeply personal family matters, insinuating that Plaintiff's conduct during the children's upbringing involved experiences that he claimed he and his late brother would "take to the grave."

83. Defendant BK McKnight concluded his video by declaring that "the gloves are off" – signaling his intent to continue publicly attacking Plaintiff.

84. These public statements further intensified the already volatile online narrative created by Defendants BK McKnight and Julie McKnight, and contributed to the continued spread of accusations portraying Plaintiff as an abusive, neglectful, or emotionally indifferent father.

---

[1] Article accessible here: https://www.stlamerican.com/arts-and-entertainment/hot-sheet-arts-and-entertainment/brian-mcknight-claims-legal-victory-against-ex-son-speaks-out/

85. Upon information and belief, the false narrative that Plaintiff had abandoned or rejected his children originated with Defendant BK McKnight in or around August 2019 and was subsequently repeated, amplified, and monetized by various individuals and media platforms through interviews, social media posts, and digital media publications.

86. As described throughout this Complaint, these false accusations were repeatedly republished and amplified across digital media platforms, forming part of the broader defamatory campaign directed at Plaintiff.

87. Defendant Hill is a media personality, commentator, and content creator who operates and distributes digital media programming to a large national and international audience through podcasts, online video platforms, and social-media channels. Defendant Hill regularly publishes and monetizes commentary and interview content through platforms including YouTube and subscription-based services such as Patreon.

88. Defendant New York Post's Page Six (or "Page Six") is a widely circulated digital entertainment publication operated by the New York Post and its parent company, News Corp. Through its website and affiliated social-media platforms, Page Six distributes celebrity news and commentary to a global audience numbering in the millions.

89. Defendant Latasha Transrina Kebe, also known as "Tasha K," is a media personality and content creator who produces and monetizes interview-based content on digital platforms, including YouTube. She has built a following of more than 1.3 million subscribers by publicizing the private lives of others and deriving revenue from controversy-driven content through her brand, UNWINEWITHTASHAK.



**<u>Defendant Kebe's Publication and Amplification of Defamatory Statements</u>**

90. On or about April 30, 2025, Defendant Kebe hosted, recorded, published, or promoted an online video interview featuring Defendant Julie McKnight (the "Kebe Interview"), which was disseminated to the public through YouTube and related digital platforms.

91. The subject of the interview with Defendant Julie McKnight was Plaintiff:



92. During the Kebe Interview, Defendant Kebe did not act as a neutral interviewer.

93. Instead, she actively participated in the development, endorsement, and amplification of a narrative portraying Plaintiff as an unfaithful husband, an absent father, and a morally deficient individual:



94. Defendant Kebe's statements during the interview ranged from malicious mischaracterizations of Plaintiff's character by spinning facts into the most damaging and negative light to outright falsehoods.

95. Defendant Kebe portrayed Plaintiff as an unrepentant, serial adulterer by asserting, among other things, that there were a multitude of "other women that he would step out with" during his prior marriage to Julie McKnight and Plaintiff has "four baby mamas . . . that we know of."

96. Defendant Kebe further asserted that, because Plaintiff rebelled against efforts by black women to "hold him accountable" for his actions, Plaintiff "**went outside to another race**" and stepped away from the "black and brown community" – as Defendant Julie McKnight described it – to marry Plaintiff's current wife, who is of Polynesian and Filipino ancestry.

97. Defendant Kebe specifically described Plaintiff's current household as "Pan-Asian" and openly admitted to "**taking shots at her [Plaintiff's wife's] race**…" throughout the interview with Defendant Julie McKnight.

98. Defendant Kebe and Defendant Julie McKnight asserted that Plaintiff had abandoned Julie McKnight and his children when they were minors.

99. Defendant Kebe specifically asserted that Plaintiff was persistently and inexcusably absent from the lives of his ex-wife and their children, saying, "he wasn't man enough to sit down and have a conversation with you about things

not going right and he wasn't even in the house to help them go right. Because in order to be a functionable husband and a functionable family, you have to be around."

100.  Defendant Kebe further stated, "you [Brian McKnight] lacked being a father to them when they were younger and then when they do come in your life, it's like now you trying to – it sounds like to me he was trying to do what he should have did [sic] when they were two or four and they're not two or four no more."

101.  Defendant Kebe injected assertions that Plaintiff abandoned his children by stating, in reference to Defendant Julie McKnight's former boyfriend, that "Brian knew that that man was stepping in where he lacked."

102.  The natural and intended implication of Defendant Kebe's statements was to assert that Plaintiff abandoned his ex-wife and his children – while they were children – and present Plaintiff as a man of corrupt moral character who refused to act as a father to his children. Such statements were false and/or materially misleading.

103.  Defendant Kebe further went on to make assertions that Plaintiff previously pursued a sexual relationship with a high school aged girl – who Defendant Kebe described as a "baby" – and that the sexual relationship resulted in pregnancy. More specifically, Defendant Kebe stated, "she was in high school when he

started getting out here and I'm like 'how's this baby going to school? If I was that baby mama I would have sued him. Because that baby was underage….'"

104. Defendant Kebe's statements, in no uncertain terms, accuse Plaintiff of engaging in the criminal act of sex with a minor, and thus attributes criminality to Plaintiff.

105. Defendant Kebe's statements asserting that Plaintiff abandoned his children, engaged in the criminal act of sex with a minor, and similar allegations made during her interview with Defendant Julie McKnight are false.

106. Defendant Kebe further endorsed the veracity of both her accusations and the statements asserted by Defendant Julie McKnight by asserting: "Now. See, everybody ain't lying on this man" – thereby affirmatively asserting that the statements made about Plaintiff were statements of truthful fact.

107. Defendant Kebe also utilized the interview as an opportunity to further attack Plaintiff's character and religion. Defendant Kebe made multiple assertions concerning Plaintiff's moral character and even his religious convictions, commenting "I thought maybe he was just being indoctrinated by the church…."

108. Discussing Plaintiff, Defendant Kebe asserted, "That's when we say, we got a problem, Brian. That's when we say it's **little dick energy**. It's insecurities. It's you not having a grip on your household…". Such comments were intended and have the effect of bringing Plaintiff's character into disrepute.

109.   In addition, Defendant Kebe used inflammatory and degrading language to describe Plaintiff – statements intended to ridicule and demean Plaintiff before a broad public audience, such as "Okay. So, bottom line, uh, as we've already figured out, Brian McKnight pretty much ain't shit. He's what they call a dusty out here. He's one of these red pillers, little dick energy . . . . We shall pray that we don't fuck his ass up when we see him messing with them innocent kids."

110.   Upon information and belief, the slang term "dusty" is used to refer to a man who creates the appearance of success, but is a misogynist who offers and seeks nothing but sex from relationships and exploits women. Upon information and belief, Defendant Kebe knew and understood the term "dusty" to carry this meaning and intended to convey, as a matter of fact, that Plaintiff is misogynistic and exploitative of women.

111.   Upon information and belief, the slang term "red piller" is used to describe a person with delusional, often "far right", beliefs, especially misogynistic beliefs such as that society is dominated and oppressed by women. The term is a cultural reference to the film, *The Matrix*, in which the character of Neo awakens to the truth by taking the "red pill." Upon information and belief, Defendant Kebe knew and understood the term "red piller" to carry this meaning and intended to convey, as a matter of fact, that Plaintiff is misogynistic, delusional, and harbors socially unacceptable beliefs.

112. Defendant Kebe's statements and allegations as to Plaintiff are substantially and materially false.

113. Defendant Kebe's conduct went beyond passive reporting and constituted active participation in the creation, endorsement, and dissemination of defamatory content. The interview was structured, framed, and promoted in a manner designed to maximize sensationalism, public outrage, and audience engagement.

114. The Kebe Interview was widely disseminated and accessible to a broad audience, and its content was both defamatory on its own and contributed to the ongoing republication and amplification of false and defamatory statements concerning Plaintiff.

115. At no time did Defendant Kebe undertake any effort to verify the accuracy of the statements presented during the interview, nor did she seek comment from Plaintiff prior to publication. Defendant Kebe failed to contact Plaintiff prior to publication, despite the serious and damaging nature of the accusations, and provided Plaintiff no opportunity to respond.

116. Defendant Kebe further used inflammatory and derogatory language to describe Plaintiff, demonstrating hostility, bias, and a reckless disregard for the truth.

117. The interview was structured, framed, and promoted to maximize sensationalism, public outrage, and audience engagement, evidencing a motive to prioritize attention and monetization over accuracy.

118. Furthermore, Defendant Kebe demonstrated her knowledge and understanding of the harmful impact the disparaging statements made by her and Defendant Julie McKnight were having and would have on Plaintiff. Defendant Kebe, referring to the purported facts presented by herself, Defendant Julie McKnight, and Defendant BK McKnight, stated, "And honestly, it has kind of turned me as a fan. Because I'm just like I can't … I can't receive the music anymore. Music is energy. It's a vibration. And the person that is coming from, their character has to be clean." Thus, Defendant Kebe's own words demonstrated her understanding of how harmful the false statements uttered by her and others would have upon Plaintiff.

**<u>The Initial Tensions between Plaintiff and Defendant Hill</u>**

119. In or around October 2025, following Plaintiff's public announcement of an $8.8 million dollar default judgment in his favor in the unrelated defamation matter against Defendant Julie McKnight for her book publication, Defendant Hill began escalating his public commentary concerning Plaintiff.

120. The following month, a public dispute emerged between Defendant Hill and Plaintiff arising from Defendant Hill's calling Plaintiff an "asshole."

121.  In response, Plaintiff made a brief comment about the name calling during an appearance with Anton Daniels in or around November 25, 2025, on YouTube.

122.  Very late in the appearance, Plaintiff expressed frustration that Defendant Hill had publicly called him an "asshole" previously despite, in Plaintiff's view, lacking a meaningful personal relationship with him. Plaintiff also expressed frustration that the Joe Budden Podcast had not given him the opportunity to appear and speak, and stated:

> But who who's that Marc, the guy, the political guy? [Defendant Hill] Let me tell you something. I'd lov – I'd destroy that dude. I would destroy him. Not – not physically, but but in a debate? Because you don't even know me, but you call me an asshole.

123.  In or around November 30, 2025, Defendant Hill appeared on an episode of the Joe Budden Podcast, a widely viewed online show with a substantial digital audience.

124.  While appearing on that program, Defendant Hill publicly referenced his dispute with Plaintiff – stating that Defendant Hill did not recall calling Plaintiff an asshole. However, Defendant Hill then stated: **"Brian McKnight, you are an asshole"** and threatened to "expose" Plaintiff.



125. When Defendant Hill was asked by Joe Budden, "Do you know where this stems from? Do you know what you've said to make Brian McKnight feel this way? What do you have to say about it? I'll totally move out the way now." Defendant Hill responded that "First, it's based on the comments we had up here. The conversation we had up here. So, I don't remember us saying nothing that

crazy about [Plaintiff]." Joe Budden replied, "No, we did." Upon information and belief, another commentator that was present stated, "We did. We've said somethings, man."

126. Defendant Hill continued, getting straight to the point: "I don't remember calling [Plaintiff] an asshole, but he's an asshole. Let me be clear. Brian McKnight – is this my camera? Brian McKnight, you are an asshole." He then proceeded to call Plaintiff a "dickhead."

127. Rather than engaging in neutral commentary, Defendant Hill's remarks increasingly took on a retaliatory tone directed personally at Plaintiff, who had only asserted that he would capably defend himself against the unprovoked personal attacks from Defendant Hill. Though Defendant Hill had previously interacted with Plaintiff, alleging that Plaintiff had behaved disrespectfully toward individuals working behind the scenes during prior interviews, it became clear that Defendant Hill was criticizing Plaintiff's character and conduct around this time for other reasons.

128. During the same Joe Budden broadcast, Plaintiff's name and personal matters with his family were discussed despite the fact that Plaintiff had previously sent a respectful direct message requesting the opportunity to appear and address the controversy himself. That request was not reviewed or acted upon prior to the discussion.

129. Pushing beyond claims of prior interactions Defendant Hill's remarks continued, stating that Plaintiff's "family business has nothing to do with me except when you make it public. And when you put your family in public on blast, that might make you an asshole."

130. Defendant Hill's statements persisted, intensifying and reigniting matters among the ongoing public discourse through Joe Budden TV surrounding Plaintiff's relationship with certain family members and litigation involving Defendant Julie McKnight:

> You worse than us. If you want to come up here and debate, I'm sure they would let you debate. But you didn't contact nobody. You're lying just like your children say you lie. And for the record, I have spoken to your children off the record. And they've told me a laundry list of shit about you that's way worse than anything has ever happened in the public. I'm not going to say that on air. We can keep that between me and you. But if you keep doing this, I will put it out. See, that's the thing. So now, if you want the smoke, keep coming. Or we can just stop this right here, my brother.

131. Encouraging Defendant Hill's conduct and statements, Joe Budden replied: "Brian McKnight. First of all, let's do this."

132. Referring to Plaintiff, another commentator, upon information and belief, a female, stated "***This n\*\*\*a*** [referencing Defendant Hill] ***in a group chat with yo' kids, n\*\*\*a***." Joe Budden then stated Plaintiff's kids have listened to the show and "***that's how I know that I've said some shit***" about Plaintiff.

133. Plaintiff **did not** publicly respond to Defendant Hill or Joe Budden, nor did Plaintiff "keep coming" at Defendant Hill.

134. And despite Defendant Hill's statement that Defendant Hill would stop this with the Joe Budden broadcast, Defendant Hill continued his public smearing campaign against Plaintiff.

135. The next day, on December 1, 2025, *Complex* – media platform focused on music, streetwear, sneakers, pop culture, and style – published an article entitled: **"Marc Lamont Hill Fires Back After Brian McKnight Calls Him Out: 'You Are an A-hole.'"**

136. The day after that, on December 2, 2025, *BET* (or "Black Entertainment Television") also published a follow-up article entitled "*Marc Lamont Hill Claps Back at Brian McKnight*," again **quoting Defendant Hill's personal remarks and expanding on his public criticism of Plaintiff**.

137. The *BET* article reported additional details about Defendant Hill's conduct, direct statements, and communications behind the scenes.

138. According to BET, after Plaintiff "name-checked him on a podcast and threatened to 'destroy' him," **Defendant Hill responded, "'[f]or the record, I've spoken to your children off the record and they told me a laundry list of sh\*t about you that's way worse than anything that's ever happened in the public**.'"

139.  The article continues, stating that "**Hill threatened McKnight claiming if he keeps 'doing this,' [Hill is] going to share the private information he knows about [Plaintiff's] estranged family.**"

140.  Defendant Hill's comments on Joe Budden TV and statements repeated by BET demonstrated a personal vendetta against Plaintiff for being 'name-checked.' It also reveals that Defendant Hill had threatened to use Plaintiff's family matters as a weapon against Plaintiff – despite Hill's statement to Joe Budden and others that Plaintiff's "family business has nothing to do with me . . . ."

141.  That November 30, 2025, broadcast on the Joe Budden TV platform served as a highly visible forum with 1.6 million subscribers that encouraged Defendant Hill to continue escalating the conflict and to publicly suggest that further damaging information about Plaintiff could be revealed.

142.  In other words, the Joe Budden TV publication became a springboard for Defendant Hill to continue to escalate or encourage Defendant Hill's publication of the tensions between himself and Plaintiff.

**Defendant Hill's Retaliation against Plaintiff**

**for "Name-Checking" Defendant Hill**

143.  The sequence and timing of Defendant Hill's public statements via Joe Budden TV on November 30, then a publication by *Complex* on December 1

referencing the same, followed by a detailed BET article quoting Defendant Hill on December 2, 2025, are telling. The publication timeline and Defendant Hill's statements to Joe Budden and BET set the stage for the commencement of a retaliatory campaign culminating in the defamatory broadcast central to this action.

144.   Shortly thereafter, Defendant Hill proceeded to arrange, record, and release an interview with Defendant Julie McKnight and Defendant BK McKnight, a key focus of which was false assertions of Plaintiff's purported misconduct and mistreatment of their deceased son, Niko McKnight.

145.   By enlisting estranged family members of Plaintiff, Defendant Hill deliberately sought to amplify personal discord into a public spectacle, turning private grievances into a false narrative of moral failure.

146.   His actions reflected pre-existing hostility toward Plaintiff, alignment with Plaintiff's ex-wife, Defendant Julie McKnight, and Defendant BK McKnight, who had already made false accusations about abandonment, and a willingness to broadcast private matters that he knew or should have known were false, without context or verification.

147.   These facts show a clear and retaliatory motive immediately preceding the December 5, 2025, interview and broadcast.

148.   On or about November 30, 2025, Defendant Hill threatened to "expose" details of Plaintiff's family life and teased forthcoming "information" about Plaintiff's relationship with his children, implying misconduct and severe moral deficiency.

149.   Within the same week, Defendants Hill, Julie McKnight, and BK McKnight recorded or published an online video interview in which they made and promoted specific accusations regarding Plaintiff's conduct toward his late son, Niko McKnight, during Niko's terminal illness. During the interview, Defendants asserted that Plaintiff refused to communicate with his son during his final illness, refused to tell him that he loved him before his death, and emotionally abandoned him during his final days – accusations that portrayed Plaintiff as a father who withheld love and compassion from his dying child.

150.   Upon information and belief, Defendant Hill knew that the statements made by Defendants Julie McKnight and BK McKnight would injure Plaintiff's reputation.

**<u>Monetizing the Tortious December 5, 2025, Broadcast</u>**

151.   On or about December 5, 2025, Defendant Hill published portions of the interview featuring Defendant Julie McKnight and Defendant BK McKnight on his platforms, including YouTube and Instagram.

152.   Defendant Hill first released a short, highly edited clip from the interview rather than the full recording. The excerpted clip focused on the most emotionally charged, damning, and *false* accusation – that Plaintiff refused to tell his dying son Niko that he loved him – and was disseminated through social-media platforms in a manner designed to provoke immediate outrage and maximize online engagement.

153.   The released clip had the intended effect – provoking outrage and maximizing online viewing and engagement.

154.   Defendant Hill's platform has hundreds of thousands of subscribers and followers, and the broadcast quickly accumulated thousands of views, dramatically expanding the reach of the accusations.

155.   The interview was marketed as exclusive and emotional content, with promotions urging viewers to subscribe to paid platforms for the "full" version:



156.   During the broadcast, Defendants Julie McKnight and BK McKnight falsely claimed that Plaintiff refused to speak to his son during his final days, refused to say "I love you," and had abandoned him.

157.   During the interview, Defendant Hill made certain to ask Defendant BK McKnight about his earlier statements in August 2019 regarding Plaintiff abandoning them. Defendant BK McKnight responded, and falsely portrayed Plaintiff as a father who abandoned his children by stating that he would "never turn [his] back on [his] children" – clearly implying that Plaintiff had done exactly that.

158.   The statement was presented as a factual description of Plaintiff's conduct by Defendants and was intended to reinforce the narrative that Plaintiff had rejected

and abandoned his own children. Defendant Hill was deliberate in drawing out that narrative:

| Defendant Hill: | What were you trying to communicate in 2019? What exactly were you trying to communicate? |
| Defendant BK McKnight: | That I would never do that. |
| Defendant Hill: | Do what? What's the thing? |
| Defendant BK McKnight: | [T]urn my back on my children no matter what they've done. |

159. Defendant Julie McKnight stated and alleged she and Plaintiff's young sons were, in effect, forced to leave by Plaintiff during their early marriage:

| Defendant Julie McKnight: | "When I was asked to leave with my children at 3 and 6, I was asked I – we came home." |
| Defendant Hill: | "Asked, you mean like put out of the house?" |
| Defendant Julie McKnight: | "Absolutely." |

160. Demonstrating the falsity of Defendant Julie McKnight's statement, a few minutes after making the above false representation that Plaintiff had expelled her and their children from his home, Defendant Julie McKnight affirmed that

leaving the family home was her decision. "Why am I moving with my kids? But at that time, I was like, you know what? **I just want to be I – I – I want to be out.** *I want to be out.* **I want to be out. And** *we* **moved.**"

161.   Around 55 minutes into the interview, Defendant Hill pivoted with Defendant Julie McKnight and Defendant BK McKnight, carefully guiding the delicate conversation into private matters (which, notably, he previously stated to Joe Budden on YouTube that he would not do), stating: "when I heard [Plaintiff] talk about the timeline, there were some things that I thought were worth at least discussing."

162.   Defendant Julie McKnight claimed that during a telephone call with their son shortly before his death, Plaintiff focused on grievances about his "new family" rather than offering comfort or support.

163.   Defendant Julie McKnight further asserted that their son repeatedly told Plaintiff "I love you" during the call while Plaintiff refused to reciprocate, thereby portraying Plaintiff as emotionally cruel and indifferent toward his terminally-ill son.

164.   Defendant BK McKnight also stated:

    a.   "I begged my dad to talk to my brother [Niko] seconds for two years . . . . The lies, man. The unnecessary lies . . . . I begged him to talk to [Niko]."

b. "I have always tried to make amends with my dad – publicly even. I have stated multiple times I'm willing to do that. **I have taken my accountability for my post because that's where this started**. **The guilt on my shoulders for all of this**, for that even, you know, **we don't get here without that**. But it's like he had ample opportunity to show up and be my brother's dad. Forget your help."

c. "I get no responses . . . . I'm texting and DMing to deaf ears as far as we know."

d. "**One of the darkest and coldest and most disheartening memories of my life is the day my brother calls** me sobbing with all that he's going through, looking death in the eye **to tell me I'm right about telling him [Niko] not to call my father** because I knew what was going to happen, because **I knew where _my_ dad was**. **I told him dad is gone**."

165.   Yet, Defendant BK McKnight's own statements demonstrate that he was not merely describing events. Rather, he acknowledged his role in initiating the estrangement following his August 2019 statements, admitting: "I have always tried to make amends with my dad . . . . for my post because that's where this started . . . . the guilt on my shoulders for all of this . . . we don't get here without that."

166. Further, Defendant BK McKnight's statements reflect that he actively influenced and interfered with the relationship between his brother, Niko, and Plaintiff. Specifically, Defendant admitted that he discouraged contact between Niko and Plaintiff, stating that he told him not to call his father, and affirmatively represented to Niko that "dad is gone," thereby shaping the estrangement and restricting Niko's perception of Plaintiff and limiting any opportunity for direct communication.

167. Defendant BK McKnight continued, stating that Plaintiff stated to Niko, "I can't arbitrarily say that I love you." Siezing the opportunity to act on his underlying motives, Defendant Hill asked "I'm sorry, I have to ask that again" – encouraging Defendant BK McKnight to repeat his statement.

168. Defendant Julie McKnight falsely stated that Plaintiff talked "belittling to [Niko]" on his deathbed, that "the fact that [Plaintiff] chose to no longer reach out is the fact that [Plaintiff wasn't] able to control the [ ] entire situation."

169. Soon after, Defendant BK McKnight attacked Plaintiff regarding the default judgment statements Plaintiff made regarding Defendant Julie McKnight in or around October 16, 2025, and stated: "*the narcissistic strategy behind just trying to be a dick*, clicking your heels on the internet. What the fuck is wrong with you, bro? . . . . Does that seem like someone that y'all should take as a credible source of information with all things considered?"

170. Defendant BK McKnight continued, insinuating promiscuity by Plaintiff stating, "*[s]eeing my dad with women is nothing new*."

171. Throughout the interview, Defendant Hill encouraged and provoked Defendants Julie McKnight and BK McKnight – no different than Joe Budden and others had encouraged him the week prior on the Joe Budden publication.

172. Defendant Hill guided the discussions and topics, presented Defendants' statements as fact, providing no context or opportunity for Plaintiff to respond, and made no effort to verify their truth.

173. Quite clearly, within days of his own public threats against Plaintiff on the Joe Budden broadcast and statements made to BET, Defendant Hill broadcast a defamatory interview across YouTube and Patreon, dramatically amplifying its reach.

174. The broadcast's central falsehood – that Plaintiff refused to tell his dying son he loved him – was portrayed as undisputed truth and constitutes defamation per se.

175. Defendants' false portrayal of Plaintiff as an unfeeling father is directly contrary to the reputation that underlies these professional associations.

176. Before the false statements at issue, Plaintiff maintained strong relationships with other professionals in the music industry and with his audience, all of which contributed to his commercial success and goodwill.

177.    Following the defamatory broadcast of Defendant Hill's "interview" with Defendant Julie McKnight and Defendant BK McKnight, several media representatives, concert promoters, and charitable partners contacted Plaintiff's management to express concern about "optics" and potential controversy, resulting in suspension or termination of engagements.

178.    Plaintiff's concert attendance metrics show measurable declines beginning after the publication, as well as multiple cancellations by various venues, further evidencing economic harm linked to the defamatory statements.

179.    Accordingly, the false statements directly impaired the goodwill and income potential that Plaintiff's decades of artistry and public service had established.

180.    Whether driven by personal vendetta or monetary gain, Defendant Hill acted either intentionally or with reckless disregard for truth. These actions – public threats implying additional damaging information, the booking of a hostile interview with Plaintiff's estranged family members, the strategic release of an emotionally charged excerpt designed to provoke outrage, and the delayed release of the full interview – demonstrate a pattern of malicious conduct, intentional narrative engineering, and reckless disregard for the truth.

181.    The edited clip quickly circulated across social media and entertainment media platforms, generating significant public attention and condemnation directed toward Plaintiff.

182. By releasing the inflammatory excerpt first and the full interview later, Defendant Hill ensured that the most damaging and sensationalized accusation about Plaintiff would reach the public before any additional context could be considered.

183. His conduct was calculated to provoke outrage and public condemnation.

184. The resulting damage to Plaintiff's reputation circulated around the world.

185. The video was posted and monetized through YouTube and Patreon and intentionally promoted across additional platforms to capture advertising and subscription revenue.

186. Following publication, Defendants Hill, Julie McKnight, and BK McKnight repeated the allegations across multiple social-media sites including YouTube and Instagram to increase exposure and republication. Every repost, view, stream, download, and republication of the broadcast continues the dissemination of the defamatory accusations and constitutes a renewed publication causing additional harm to Plaintiff's reputation.



187.  As a direct and foreseeable result of Defendants' publication and promotion of the interview, multiple media outlets rapidly republished and amplified the accusations. Entertainment news organizations including BET and Page Six, among others, published articles excerpting the interview and repeating the central allegation that Plaintiff refused to communicate with his dying son and refused to tell him that he loved him prior to his death.

188.  These outlets embedded video clips from the interview, quoted the accusations directly, and framed the story in headlines and promotional language designed to attract audience attention.

189.  Through these republications, the defamatory statements were disseminated far beyond Defendants' original platforms and circulated across the entertainment media ecosystem, exposing Plaintiff to millions of additional viewers and readers

and substantially magnifying the reputational harm caused by the false accusations.

## Immediate Fallout and Continuing Harm

190. Upon broadcast and online publication of Defendants' false statements, the impact was immediate and widespread.

191. The allegations were rapidly repeated and reposted across social-media platforms and entertainment new sites, resulting in a surge of hostile commentary directed at Plaintiff and his family from individuals who had clearly accepted the false narrative as truth.

192. Notably, no news outlets reached out to Plaintiff or his management team to verify any purported facts or seek comment or statement.

193. The sudden spread of the false statement disrupted Plaintiff's professional routine and created substantial concern among promoters, partners, and colleagues who had long associated him with messages of love and emotional sincerity.

194. Despite knowing the statements were false, Defendants made no effort to mitigate the harm to Plaintiff. As of the date of this filing, they have not retracted or corrected their false statements.

195. As the statements continued to circulate, new online posts and blog summaries repeated them without context, embedding the falsehood permanently connecting

it to future searches of Plaintiff's name in commonly used search engines, such as Google.

196.   The continuing accessibility of the broadcast has prolonged the reputational harm to Plaintiff long after its initial publication.

197.   As a direct and foreseeable consequence, Plaintiff has endured a sustained wave of negative publicity, hostile public commentary, severe emotional distress, and significant injury to his standing in the entertainment industry and the community at large.

## The Direct Impact on Plaintiff & Plaintiff's Wife

198.   The defamatory statements struck at the core of Plaintiff's livelihood and public identity.

199.   Plaintiff's decades-long career has been built upon love and genuine affection, emotional honesty, and authenticity.

200.   His commercial viability and professional reputation depend significantly upon public goodwill and audience trust.

201.   By falsely depicting him as a father devoid of compassion, among other false representations, Defendants' publication attacked the very qualities that define his professional reputation and commercial appeal.

202.   The widespread dissemination of these lies caused immediate economic and emotional consequences.

203. As the accusations concerning Plaintiff circulated online, the resulting commentary frequently extended beyond criticism of Plaintiff and included hostile messages directed at members of Plaintiff's family.

204. Social-media users and online commentators repeated the allegations that Plaintiff had abandoned his children and, in many instances, directed abusive and threatening commentary toward Plaintiff, Plaintiff's spouse, their three (3) year old son, and other individuals associated with Plaintiff.

205. Members of Plaintiff's household were subjected to repeated online harassment, including messages accusing Plaintiff of being a neglectful and morally depraved father and demanding that he be publicly shamed or ostracized.

206. Plaintiff's wife, Mrs. Leilani McKnight, in particular, became the target of repeated online attacks tied directly to the narrative portraying Plaintiff as having abandoned his children. These attacks included hostile messages, derogatory commentary, and accusations repeated across social-media platforms.

207. Among the various accusations made were assertions that Mrs. Leilani McKnight was responsible for Plaintiff's divorce from Defendant Julie McKnight and that Leilani had caused Plaintiff to abandon his children. In reality, Plaintiff and Leilani McKnight did not meet until more than a decade after Plaintiff's prior divorce (2003) and well after the children of Plaintiff and Defendant Julie McKnight were grown adults.

208.    The persistence of these online attacks created a climate in which members of Plaintiff's family reasonably feared further harassment and personal targeting whenever Plaintiff appeared publicly, released new music, or engaged with fans online.

209.    The ongoing circulation of these accusations, combined with the hostile responses they generated, inflicted significant emotional distress upon Plaintiff and his family and contributed to the broader reputational harm caused by the defamatory narrative.

### Defendants' Harm to Plaintiff's
### Professional Standing and Reputation

210.    Plaintiff is an internationally recognized R&B artist whose career spans decades and whose reputation has been built upon talent, discipline, and an emotional connection with audiences worldwide.

211.    Plaintiff resides in Georgia, which serves as the center of his professional operations, touring logistics, projects and business relationships.

212.    As a global recording artist, Plaintiff's livelihood depends upon business conducted both within and beyond Georgia, including concert bookings, touring agreements, music projects, venue contracts, brand partnerships, television appearances, and streaming and licensing relationships.

213.   Fictitious allegations that Plaintiff is emotionally cruel, morally depraved, or incapable of expressing love to his dying child strike directly at the foundation of the public identity he has spent decades building.

214.   Such allegations do not merely criticize Plaintiff; they undermine the precise reputation and brand upon which Plaintiff's global career has been built. The same public platforms that once shared his music and charitable work instead circulated the defamatory narrative, resulting in substantial, measurable loss of goodwill.

215.   These cascading effects have inflicted tangible financial losses together with ongoing humiliation and mental anguish.

216.   Each continued viewing or republication of Defendants' broadcast operates as a renewed injury to Plaintiff's reputation and professional prospects.

217.   For example, Plaintiff has experienced reduced invitations for appearances and performances, interruptions in ongoing business discussions, and damage to ongoing relationships with followers and supporters who had always viewed him as a symbol of integrity and empathy:



218.  Defendants knew at all relevant times that Plaintiff was a Georgia resident and understood that any reputational injury inflicted upon him would cause economic harm both within Georgia and globally.

219.  Despite that knowledge, or perhaps because of it, Defendants chose to publish, promote, and repeatedly amplify a series of false and defamatory accusations concerning Plaintiff's conduct as a father. Defendants asserted that Plaintiff refused to communicate with his dying son, refused to tell him that he loved him during his final days, emotionally abandoned him during his illness, and broadly rejected or disowned his children.

220.  These accusations were not isolated remarks but part of a coordinated narrative portraying Plaintiff as a father who was cruel, indifferent, and morally incapable of expressing love or compassion toward his dying child.

221.  By repeating and amplifying these allegations through interviews, social media, and media publications, Defendants intentionally constructed and disseminated a false public narrative designed to destroy Plaintiff's reputation.

222. The accusations were uniquely inflammatory and knowingly false, imputing emotional cruelty, parental abandonment, and moral depravity to Plaintiff.

223. Such accusations strike at the very core of Plaintiff's character and professional standing.

**Coordination, Amplification and Republication**

**by Defendants including Page Six**

224. After Defendant Hill's December 5, 2025, broadcast, numerous media outlets recirculated its content and themes.

225. Entertainment sites, podcast platforms, social media channels, and independent commentators quoted and reposted the false accusations, thereby magnifying the defamatory impact on Plaintiff:



226. At the same time, excerpts, commentary, and headlines repeating the accusations were republished and circulated by multiple media outlets and online commentators.

227. These republications included entertainment news sites, digital commentary channels, and social media accounts that repeated the allegation that Plaintiff had refused to tell his dying son that he loved him.

228. In many instances, the accusations were presented through emotionally charged headlines, promotional clips, and commentary designed to attract audience engagement and maximize viewership.

229. As a result of this continued amplification across podcasts, media outlets, and social-media platforms, the accusation that Plaintiff refused to tell his dying son he loved him spread rapidly across the internet and reached millions of viewers and readers.

230. The resulting public reaction included widespread condemnation of Plaintiff, hostile commentary directed toward Plaintiff and his family, and further repetition of the defamatory accusations across online platforms and media outlets.

231. The timing of some online publications make clear that Defendants were advancing a campaign against Plaintiff. For example, on or about December 4, 2025, Defendant New York Post's Page Six, a widely circulated entertainment news publication with substantial national and international readership, published and promoted an article regarding the accusations made during interview hosted by Defendant Hill (which was broadcast on December 5, 2025). In other words, Defendant New York Post's Page Six found out about the interview with Defendant Hill the day before it was published, and one or more Defendants ("an insider", according to Page Six) coordinated and took steps to make similar statements to Defendant New York Post's Page Six for the purpose of the tortious statements being published elsewhere and to cast Plaintiff in a false light.





232. The following day, on or about December 5, 2025, another article was published and promoted by Defendant New York Post's Page Six titled "Brian McKnight's ex-wife blasts singer's 'heartbreaking' choice not to tell dying son Niko 'I love you'". According to the article, written by Tamantha Ryan and Riley Cardoza, Defendant Julie McKnight made exclusive statements to Page Six, including repeating the accusation that Plaintiff refused to communicate with their dying son, Niko, and refused to tell Niko that he loved him during his final days.

233.   Defendant New York Post's Page Six again presented these accusations to its audience as factual statements describing Plaintiff's conduct as a father, opening the article with "Brian McKnight's ex-wife was heartbroken to hear the singer refused to tell their son Niko "I love you" on his deathbed." The statements were not framed as unverified allegations, disputed claims, or commentary regarding an ongoing family disagreement. Instead, the article conveyed the accusations as credible factual assertions concerning Plaintiff's character and actions.

234.   Defendant New York Post's Page Six further promoted the article through its media platforms, encouraging readership engagement and driving traffic to the publication.

235.   The promotional framing used by Page Six was not neutral. Rather, it validated and amplified the accusations against Plaintiff by presenting them as emotionally charged revelations about Plaintiff's conduct toward his dying child.

236.   But by repeating and promoting these accusations, and those made by Defendants, Defendant New York Post's Page Six dramatically expanded the reach of the defamatory narrative beyond the original broadcast and exposed Plaintiff to a far broader audience.

237.   Page Six's publication and promotion of these accusations occurred despite the obvious reputational harm inherent in broadcasting allegations that a father abandoned his dying son.

238. As a professional media organization, Page Six understood – or at minimum should have understood – the devastating reputational consequences that such accusations would cause if repeated without verification.

239. Despite the seriousness of the accusations, Page Six failed to contact Plaintiff before publication to request comment, explanation, or response.

240. Upon information and belief, Defendant New York Post's Page Six likewise failed to investigate the underlying facts before publishing the article, including documentary communications contradicting the narrative that Plaintiff refused to communicate with his son.

241. As a direct result of the defamatory publications and their widespread amplification, Plaintiff experienced measurable professional harm. Performances and business opportunities were canceled or withdrawn, including bookings and appearances in major markets such as Detroit, Washington D.C., Baltimore, Memphis, Houston, Charlotte, Raleigh, Chicago, and Plaintiff's hometown of Atlanta.

## Actual Malice of Defendants

242. Plaintiff is a public figure whose career rests on public trust and authenticity.

243. Defendant Hill openly displayed his hostility and animosity toward Plaintiff on November 30, 2025, and on December 1–2, 2025, referencing private conversations with Plaintiff's children, and then airing the December 5 interview

with Defendants Julie McKnight and BK McKnight without seeking verification or comment. Defendant Hill's repeated threats to "expose information" about Plaintiff if he responded (*which Plaintiff did not*) reflect a calculated effort to harm and intimidate Plaintiff. These threats were intended to silence Plaintiff, not to engage in legitimate public discussion.

244.   Publishing such damaging allegations without inquiry demonstrated reckless disregard for truth and supports a finding of actual malice.

245.   Defendant Julie McKnight knew that her statements were false because she had personally insisted that Plaintiff not contact his son Niko.

246.   Yet during this period, Plaintiff actively sought to assist and support his son in every way available to him. Plaintiff arranged for the availability of world-class medical professionals and prepared living accommodations designed to ensure that his son would receive the highest level of care, comfort, and medical attention during his illness.

247. **Defendant Julie McKnight actively inserted herself into the communications surrounding their son Niko's care and expressly directed Plaintiff not to initiate contact with him – <u>a demand that was made in a preserved voice message recording sent to Plaintiff by Defendant Julie McKnight</u>**. Plaintiff complied with those directives out of respect for family boundaries during an already painful and volatile period and to avoid contributing

to conflict or spectacle while his son lay dying. Despite having imposed those restrictions herself, Defendant Julie McKnight publicly accused Plaintiff of abandoning his dying son and refusing to express love to him during his final days. By first preventing contact and then advancing a narrative that Plaintiff chose not to be present, Defendant Julie McKnight knowingly manufactured and promoted a false portrayal of Plaintiff's conduct for her own advantage.

248. Defendant BK McKnight acted with actual malice in publishing and disseminating statements concerning Plaintiff.

249. At the time he made the statements at issue, Defendant BK McKnight possessed personal knowledge of Plaintiff's role as a father and his longstanding relationship with his children, including facts directly contradicting the narrative he chose to publish.

250. Despite this knowledge, Defendant BK McKnight publicly portrayed Plaintiff in a manner inconsistent with those known facts, demonstrating either knowledge of falsity or reckless disregard for the truth.

251. Defendant BK McKnight further acted with actual malice by publishing his statements in a highly charged and emotionally driven context, with the intent to damage Plaintiff's reputation and to influence public perception, rather than to convey truthful or balanced information.

252. Defendant BK McKnight failed to take any steps to ensure the accuracy of the statements he published, and instead relied on subjective grievances and personal animus, evidencing a reckless disregard for whether the statements were true or false.

253. Defendant Kebe acted with actual malice in publishing and promoting the April 30, 2025, Kebe Interview. Prior to and during the broadcast, Defendant Kebe demonstrated a preconceived belief in the truth of the accusations against Plaintiff, including by stating that "everybody ain't lying on this man," thereby evidencing her willingness to accept and promote defamatory statements without verification.

254. Defendant Kebe relied exclusively on statements from an interested and biased source, Defendant Julie McKnight, without undertaking any effort to corroborate the allegations or review readily available information contradicting them. Defendant Kebe posed leading and assumptive questions that treated unverified allegations as established fact, demonstrating a deliberate effort to construct and reinforce defamatory narratives rather than investigate the truth. These facts demonstrate that Defendant Kebe acted with knowledge of falsity or, at minimum, reckless disregard for the truth.

<h2 style="text-align:center">CAUSES OF ACTIONS</h2>

<h3 style="text-align:center">COUNT ONE</h3>

**Defamation (Libel & Slander) (O.C.G.A. § 51-5-1 et seq.)**

**(Against Defendants Hill, Julie McKnight, NYP Holdings, Inc., d.b.a. New York Post, BK McKnight, and Latasha Transrina Kebe)**

255.  Plaintiff repeats and realleges each and every preceding paragraph of this Complaint as if fully set forth herein.

256.  Defendant Kebe participated in the publication and republication of defamatory statements concerning Plaintiff through her April 30, 2025, Kebe Interview with Defendant Julie McKnight.

257.  During that interview, Defendant Kebe did not act as a neutral interviewer. Rather, she actively endorsed, adopted, and amplified defamatory statements concerning Plaintiff.

258.  Defendant Kebe asserted and repeated multiple false statements about Plaintiff, including but not limited to accusations that Plaintiff abandoned his children and engaged in a sexual relationship with a minor, whom he purportedly impregnated.

259.  Defendant Kebe presented all of the allegations against Plaintiff as matters of established fact, when Kebe knew or should have known that they were false and/or misleading.

260. In addition, Defendant Kebe posed leading and assumptive questions that treated allegations of infidelity and misconduct as established fact and presenting the same in the most harmful and negative light possible.

261. Defendant Kebe further ridiculed and demeaned Plaintiff through inflammatory and derogatory statements, including referring to Plaintiff as "dusty," a "red piller," and possessing "little dick energy," thereby reinforcing the defamatory narrative presented during the broadcast with Defendant Julie McKnight which was published on YouTube on April 30, 2025.

262. These statements were false and were presented to viewers as factual assertions concerning Plaintiff's character and conduct.

263. On or about December 5, 2025, Defendant Marc Lamont Hill hosted, recorded, published, promoted, and monetized an online interview featuring Defendant Julie McKnight and Defendant BK McKnight.

264. The interview was presented to viewers as a truthful and revealing account of Plaintiff's conduct toward his son, Niko McKnight, during Niko's terminal illness and was framed as a controversial exposé concerning Plaintiff's character and actions as a father.

265. During the broadcast, Defendants Julie McKnight and BK McKnight publicly asserted as fact that Plaintiff:

   a. refused to communicate with his dying son;

b. refused to tell his son "I love you" prior to his passing; and

c. emotionally abandoned him during the final and most vulnerable period of his life.

266. These statements, as well as others before and after, were false. Documentary evidence directly contradicts the narrative advanced by Defendants. Preserved voicemail communications from Defendant Julie McKnight instructed Plaintiff not to initiate contact with Niko during this period. Despite imposing those restrictions, Defendant Julie McKnight (and Defendant BK McKnight) participated in one or more broadcasts accusing Plaintiff of abandoning his dying child.

267. Defendant Hill exercised editorial control over the broadcast, including its structure, framing, and promotion. Rather than challenge the accusations, Defendant Hill reinforced them through his questioning and commentary and promoted the interview as emotionally charged and exclusive content across monetized platforms including YouTube and Patreon.

268. Defendant Hill did not contact Plaintiff prior to publication and provided Plaintiff no opportunity to respond to the accusations before broadcasting them to the public.

269. In the days immediately preceding the interview, Defendant Hill publicly attacked Plaintiff on widely viewed platforms, referring to him as "an asshole,"

stating that he had spoken with Plaintiff's children "off the record," and threatened that he could reveal additional private information concerning Plaintiff's family if Plaintiff responded.

270. Despite knowing that Plaintiff had attempted to support his son during his illness – including offering medical assistance and accommodations – Defendants advanced a narrative portraying Plaintiff as cruel, indifferent, and emotionally absent.

271. The accusations were uniquely damaging. Plaintiff's decades-long career and public reputation are closely associated with themes of love, emotional sincerity, and family devotion, and the broadcast portrayed him to viewers worldwide as a father incapable of expressing love to his dying child.

272. The accusations quickly spread beyond Defendant Hill's platform. Entertainment media outlets, online commentators, and social-media accounts republished and discussed the interview, repeating the same allegations to a vastly expanded audience.

273. Defendant New York Post, through Page Six, further amplified the accusations by publishing articles presenting the statements as credible factual assertions concerning Plaintiff's conduct as a father, without contacting Plaintiff or investigating readily available evidence contradicting the allegations.

274. As a result, the defamatory accusations were disseminated to millions of viewers and readers across the United States and internationally.

275. The reputational impact was immediate. At the very time Plaintiff was grieving the loss of his son, Defendants broadcast to the world the false narrative that Plaintiff had refused to express love to that son during his final days.

276. Following publication and republication of the accusations, journalists, business partners, and members of the public contacted Plaintiff's management seeking confirmation of the allegations, and several professional opportunities and engagements were disrupted or suspended.

277. Plaintiff is a public figure, and Defendants acted with actual malice by publishing accusations they knew to be false or with reckless disregard for the truth, including by relying on statements from estranged family members, failing to investigate contradictory evidence, failing to seek comment from Plaintiff, and continuing to publish the accusations.

278. As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered severe reputational injury, economic loss, humiliation, and profound emotional distress in Georgia and throughout the United States and internationally.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants jointly and severally, for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages due to Defendants' and malicious conduct;

- Attorneys' fees and costs of suit as permitted by law;

- Injunctive relief prohibiting further defamatory publication and requiring removal of the defamatory content; and

- Such other and further relief as the Court deems just and proper.

## COUNT TWO

**Defamation Per Se (O.C.G.A. § 51-5-4)**

**(Against Defendants Hill, Julie McKnight, NYP Holdings, Inc., d.b.a. New York Post, BK McKnight, and Latasha Transrina Kebe)**

279.  Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

280.  Plaintiff is an internationally recognized recording artist whose career spans more than three decades.

281.  Over that time, Plaintiff has released nineteen studio albums, sold more than thirty million albums worldwide, received seventeen Grammy Award nominations, and performed for audiences throughout the United States and internationally.

282.  Plaintiff's professional identity has long been associated with themes of love, emotional sincerity, romantic authenticity, and devotion to family.

283.  Defendants' accusation that Plaintiff refused to tell his dying son "I love you" directly attacks the foundation of that reputation.

284.  The accusation falsely portrays Plaintiff as a father who withheld love and compassion from his own child during the final days of a terminal illness and therefore imputes moral turpitude, emotional cruelty, parental abandonment, and debased moral character

285.  For a performer whose career is built upon expressions of love, vulnerability, and emotional sincerity, such an accusation naturally tends to injure Plaintiff in his profession by striking at the very qualities that define his public reputation and relationship with audiences.

286.  Defendant Hill broadcast and promoted the accusation through a monetized online interview distributed on platforms including YouTube and Patreon, presenting the statements as truthful accounts of Plaintiff's conduct.

287.  During that broadcast, Defendants Julie McKnight and BK McKnight repeated and reinforced the accusation that Plaintiff refused to tell his dying son that he loved him.

288.  Defendants knew these statements were false. Documentary evidence, including preserved voicemail communications from Defendant Julie McKnight directing Plaintiff not to initiate contact with his son, directly contradicts the narrative presented during the broadcast.

289. Despite knowing that Plaintiff had offered medical assistance and living accommodations for his son during his illness, Defendants publicly portrayed Plaintiff as a father who abandoned his dying child.

290. The accusations quickly spread beyond Defendant Hill's platform as entertainment media outlets, commentators, podcast hosts, and social-media accounts repeated and discussed the statements.

291. Defendant New York Post's Page Six further amplified the narrative by publishing articles repeating the accusations as factual assertions concerning Plaintiff's conduct as a father without contacting Plaintiff or reviewing readily available evidence contradicting the allegations. Defendant's publishing of such damaging allegations without inquiry demonstrated reckless disregard for truth and supports a finding of actual malice.

292. As a result, the defamatory narrative was disseminated to millions of viewers and readers and became embedded in public commentary concerning Plaintiff.

293. The accusation that Plaintiff refused to express love to his dying son is one of extraordinary cruelty and strikes at the moral character of any parent, particularly a father mourning the loss of his child.

294. Defendant Kebe's statements during the Kebe Interview likewise constitute defamation per se. By portraying Plaintiff as an absentee and neglectful father, as well as culpable for committing the criminal act of sex with a minor, Defendant

Kebe falsely imputed moral turpitude, criminality, and conduct incompatible with Plaintiff's profession and public identity.

295. For a recording artist whose career is built upon themes of love, emotional sincerity, and devotion to family, such accusations naturally tend to injure Plaintiff in his trade and profession.

296. The reputational damage was immediate. Media representatives, concert promoters, and charitable partners contacted Plaintiff's management expressing concern about the accusation, and certain professional engagements and opportunities were disrupted or suspended.

297. Under O.C.G.A. § 51-5-4(a) and (b), statements that falsely impute moral turpitude or that tend to injure a person in his trade or profession constitute defamation per se.

298. Defendants' statements fall squarely within that category and therefore constitute defamation per se under Georgia law.

299. Because the statements constitute defamation per se, damages are presumed.

300. Defendants acted with actual malice by publishing and amplifying statements they knew to be false or with reckless disregard for the truth and by continuing to disseminate the accusations.

301.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial injury to his reputation, professional standing, economic interests, and personal well-being.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants for:

- Compensatory damages in an amount to be determined at trial;

- Punitive damages due to Defendants' malicious and intentional conduct;

- Attorneys' fees and litigation costs as permitted by law;

- Pre- and post-judgment interest; and

- Such other relief as the Court deems just and proper.

## **COUNT THREE**

**False Light Invasion of Privacy/Disclosure of Embarrassing Private Facts**

**(Against Defendants Hill, Julie McKnight, NYP Holdings, Inc., d.b.a. New York Post, BK McKnight, and Latasha Transrina Kebe)**

302.  Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

303.  On or about December 5, 2025, Defendants Hill, Julie McKnight, and BK McKnight publicly portrayed Plaintiff as a father who refused to tell his dying son that he loved him and who emotionally abandoned his child during the final days of the child's life.

304. That portrayal was false and was presented during the broadcast hosted by Defendant Hill as a truthful account of Plaintiff's conduct and character rather than as speculation, opinion, or a disputed family disagreement.

305. Defendant Hill exercised editorial control over the recording, framing, and promotion of the interview and presented the accusations to viewers as credible and reliable. Rather than question the allegations, Defendant Hill's commentary and responses reinforced the narrative being presented.

306. Defendant Hill promoted the interview across social-media platforms as emotionally charged and exclusive content and directed viewers to monetized platforms including YouTube and Patreon. He did not contact Plaintiff prior to publication and made no attempt to verify the accusations before presenting them to a global audience.

307. During the broadcast, Defendants Julie McKnight and BK McKnight supplied and reinforced the central accusation that Plaintiff refused to communicate with his son during his final illness and refused to tell him that he loved him.

308. Defendants knew this portrayal was false. Prior to the broadcast, Defendant Julie McKnight had directed Plaintiff not to contact his son Niko, yet later publicly portrayed Plaintiff as emotionally absent and indifferent.

309. In reality, Plaintiff attempted to support his son during his illness, including offering medical care and living accommodations intended to ensure that his son

would receive the highest level of treatment and comfort available. These facts were omitted from the narrative presented to viewers.

310. Instead, Defendants advanced a portrayal of Plaintiff as a father who turned away from his dying child and refused even the most basic expression of love.

311. The broadcast occurred immediately after Defendant Hill had publicly attacked Plaintiff on widely viewed platforms, referring to him as "an asshole" and threatening to reveal additional private information about Plaintiff's family.

312. Within days of those statements, Defendant Hill hosted and released the December 5 interview featuring Defendants Julie McKnight and BK McKnight, transforming a private family tragedy into a public spectacle.

313. The false portrayal quickly spread beyond Defendant Hill's platform. Entertainment media outlets, podcast platforms, social-media users, and online commentators repeated and circulated the accusation.

314. Defendant New York Post's Page Six further amplified the narrative by publishing and promoting articles on December 4, 2025, and December 5, 2025, repeating the accusations and portraying Plaintiff as a father who refused to express love to his dying son, thereby placing Plaintiff before the public in a false and highly offensive light.

315. Defendant Kebe contributed to and amplified the false portrayal of Plaintiff by endorsing and repeating the accusations during her interview of Defendant

Julie McKnight which was published on YouTube on April 30, 2025, and by independently characterizing Plaintiff as a deficient father and morally unfit individual, thereby reinforcing the false narrative presented to the public.

316. Through these publications and republications, the false and/or misleading portrayal reached millions of viewers and readers and became embedded in public commentary concerning Plaintiff.

317. The portrayal was particularly damaging because Plaintiff has spent more than three decades cultivating a public persona grounded in themes of love, emotional sincerity, and compassion.

318. Defendants' depiction of Plaintiff as a father incapable of expressing love to his dying child is profoundly false and would be highly offensive to any reasonable person.

319. The accusations circulated widely while Plaintiff was grieving the loss of his son, forcing Plaintiff to confront a public narrative falsely portraying him as cruel and unloving during one of the most painful moments of his life.

320. Following publication of the broadcast and its republication across media platforms, journalists, business partners, and members of the public contacted Plaintiff's management seeking confirmation of the accusations.

321.   Certain professional opportunities were disrupted or suspended, and Plaintiff experienced measurable declines in streaming engagement and online activity following the widespread dissemination of the narrative.

322.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe reputational harm, emotional distress, humiliation, and economic injury, including injury experienced in Georgia where Plaintiff resides and maintains the center of his professional operations.

**WHEREFORE**, Plaintiff demands judgment against Defendants for:

- Compensatory damages for reputational injury and emotional distress;

- Punitive damages due to Defendants' reckless and intentional conduct;

- Costs of suit and attorney's fees as permitted by law;

- Pre- and post-judgment interest; and

- Such other relief as the Court may deem just and proper.

## COUNT FOUR

### Intentional Infliction of Emotional Distress

### (Against Defendants Hill, Julie McKnight, and Latasha Transrina Kebe)

323.   Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

324.   Only months after the death of Plaintiff's son, Niko, Defendants Hill and Julie McKnight intentionally and recklessly broadcast the false accusation that Plaintiff refused to tell his dying son that he loved him.

325.   That accusation portrayed Plaintiff to the world as a father who withheld love and compassion from his child during the final moments of the child's life – an allegation striking at one of the most fundamental moral expectations placed upon any parent.

326.   For more than three decades, Plaintiff has built a public reputation as a recording artist whose music and public persona center on themes of love, emotional sincerity, and devotion to family. By falsely portraying Plaintiff as a father incapable of expressing love to his dying son, Defendants attacked the very identity and character upon which Plaintiff's career and reputation are built.

327.   Defendant Hill's conduct occurred amid a rapidly escalating public dispute that he had initiated only days earlier. On December 1 and December 2, 2025, Defendant Hill publicly attacked Plaintiff on widely viewed platforms, referred to him as "an asshole," and threatened to disclose private information about Plaintiff's family.

328.   Within days of those statements, Defendant Hill hosted and published the December 5, 2025, interview featuring Defendant Julie McKnight and Defendant

BK McKnight, over which he exercised editorial control regarding the framing, promotion, and distribution of the broadcast.

329. Defendant Hill promoted the interview as emotionally charged and exclusive content across social media and directed viewers to monetized platforms including YouTube and Patreon, where the broadcast generated advertising and subscription revenue.

330. Defendant Hill did not contact Plaintiff prior to publication and made no meaningful effort to verify the accusations before broadcasting them to a global audience.

331. During the interview, Defendant Julie McKnight supplied and reinforced the accusation that Plaintiff refused to communicate with his son during his final illness and refused to tell him that he loved him.

332. Defendant Julie McKnight knew that accusation was false. Prior to the broadcast, she had personally directed Plaintiff not to initiate contact with their son.

333. Despite those restrictions, Plaintiff attempted to support his son during his illness, including offering medical assistance and living accommodations intended to ensure that his son received the best possible treatment and comfort available.

334.  Defendants nevertheless portrayed Plaintiff as emotionally indifferent and morally cruel while omitting these facts from the narrative presented to viewers.

335.  Defendants thereby transformed a private family tragedy into a widely circulated public spectacle designed to provoke outrage and attract online engagement.

336.  The accusation spread rapidly across social media, entertainment media outlets, podcasts, and commentary platforms, exposing millions of viewers and readers to the allegation while Plaintiff was grieving the loss of his son.

337.  Within hours of the broadcast, Plaintiff's management began receiving inquiries from journalists, business partners, and members of the public asking whether the accusation was true, and certain professional opportunities were disrupted or suspended.

338.  Plaintiff also experienced measurable declines in streaming engagement and social-media activity following the widespread dissemination of the narrative.

339.  Defendant Hill's decision to promote, monetize, and amplify the death of Plaintiff's son by broadcasting false accusations about Plaintiff's conduct toward his dying child exceeds the bounds of human decency.

340.  Defendant Julie McKnight's decision to advance and reinforce those accusations while knowing the circumstances surrounding Plaintiff's efforts to support his son likewise constitutes extreme and outrageous conduct.

341. Defendants acted intentionally or, at minimum, with reckless disregard for the severe emotional harm their conduct would cause.

342. Defendants knew or should have known that falsely portraying a grieving father as having refused love to his dying child would inflict profound emotional suffering.

343. Defendant Kebe engaged in extreme and outrageous conduct through the manner in which she structured, conducted, and broadcast her April 30, 2025, interview of Defendant Julie McKnight.

344. Rather than neutrally reporting or inquiring into disputed matters, Defendant Kebe deliberately transformed allegations concerning Plaintiff's private family relationships into a public spectacle, using provocative framing, tone, and commentary designed to inflame audience reaction.

345. Defendant Kebe repeatedly steered the discussion toward the most emotionally charged aspects of Plaintiff's personal life, particularly his relationships with his children – and presented those topics in a sensationalized and adversarial manner intended to elicit condemnation and ridicule.

346. In doing so, Defendant Kebe exploited deeply personal and sensitive family matters for entertainment and commercial gain, knowing that such subject matter carried a high probability of causing significant emotional harm.

347. Defendant Kebe further escalated the severity of her conduct by normalizing and encouraging hostility toward Plaintiff during the broadcast, including racial rhetoric suggesting that Plaintiff – a black man – had betrayed the people and community of his own race by, among other things, marrying a woman of Polynesian and Filipino descent and that Plaintiff correspondingly deserved public humiliation and social condemnation.

348. The calculated use of inflammatory tone, combined with the deliberate focus on Plaintiff's family and children, the race of Plaintiff's wife, statements regarding infidelity, and accusations of criminal misconduct transformed the broadcast from mere commentary into an attack on Plaintiff's dignity and emotional well-being.

349. Defendant Kebe knew or recklessly disregarded that this conduct, particularly when disseminated to a wide public audience and directed directly at Plaintiff would cause Plaintiff severe emotional distress.

350. Defendant Kebe proceeded to broadcast and amplify inflammatory and highly personal accusations concerning Plaintiff's role as a father, thereby causing Plaintiff emotional distress.

351. Such conduct exceeds all bounds of decency tolerated in a civilized society and constitutes extreme and outrageous behavior.

352. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, humiliation, and anguish.

353. Defendants' conduct therefore constitutes intentional infliction of emotional distress under Georgia law.

**WHEREFORE**, Plaintiff demands judgment against Defendants Hill, Julie McKnight, and Latasha Transrina Kebe for:

- Compensatory damages for emotional distress and mental anguish;

- Punitive damages due to Defendants' willful, malicious, and reckless conduct;

- Costs of suit and attorneys' fees as permitted by law;

- Pre- and post-judgment interest; and

- Such other relief as the Court may deem just and proper.

### COUNT FIVE

**Tortious Interference with Business Relations**

**(Against Defendants Hill and Julie McKnight)**

354. Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

355. For more than three decades, Plaintiff has maintained extensive business relationships throughout the entertainment industry, including live concert bookings, touring agreements, venue contracts, brand partnerships, television appearances, streaming arrangements, and licensing opportunities.

356.  Plaintiff has sold more than thirty million albums worldwide and performed internationally for decades. His professional success depends substantially on the goodwill, credibility, and reputation he has developed with audiences, promoters, sponsors, and industry partners.

357.  Plaintiff resides in Georgia, where his professional operations, touring logistics, and industry relationships are coordinated in significant part.

358.  Defendants Hill and Julie McKnight knew that Plaintiff's career and livelihood depended upon the continued strength of his reputation and his relationships with promoters, venues, media outlets, and commercial partners.

359.  Despite that knowledge, Defendants intentionally published and amplified accusations portraying Plaintiff as a father who refused to communicate with his dying son and refused to tell him that he loved him.

360.  Defendants knew or should have known that such accusations would foreseeably damage Plaintiff's reputation and interfere with his professional relationships.

361.  Following publication and widespread dissemination of the accusations, journalists, concert promoters, and industry partners contacted Plaintiff's management seeking confirmation of the allegations.

362.  As a result of the controversy created by Defendants' accusations, certain professional engagements and business opportunities were suspended, delayed, or terminated.

363.  Plaintiff also experienced measurable declines in streaming engagement and online audience activity following the dissemination of the accusations – which continue to remain publicly accessible.

364.  Defendants' conduct therefore interfered with Plaintiff's existing and prospective business relationships.

365.  As a direct and proximate result of Defendants' intentional interference, Plaintiff has suffered substantial financial losses, disruption of commercial opportunities, and damage to the professional goodwill he spent decades building.

**WHEREFORE**, Plaintiff demands judgment against Defendants for:

- Compensatory damages in an amount to be determined at trial;

- Attorneys' fees and costs of litigation as permitted by law;

- Pre- and post-judgment interest; and

- Such other and further relief as the Court deems just and proper.

## COUNT SIX

### Civil Conspiracy

### (Against Defendants Hill, Julie McKnight, and BK McKnight)

366. Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

367. Beginning on or about November 30, 2025, and December 1 and December 2, 2025, Defendant Marc Lamont Hill publicly escalated hostility toward Plaintiff through widely viewed media appearances and commentary in which he referred to Plaintiff as "an asshole," stated that he had spoken with Plaintiff's children "off the record," and threatened to disclose additional private information concerning Plaintiff's family.

368. These statements demonstrated Defendant Hill's willingness to publicly weaponize Plaintiff's private family relationships and personal grief.

369. Upon information and belief, in the days following those statements or leading up to the December 5, 2025, broadcast by Defendant Hill, Defendant Hill communicated with Defendant Julie McKnight and Defendant BK McKnight.

370. During those communications, Defendants reached an understanding and agreement to publicly accuse Plaintiff of emotionally abandoning his dying son and to disseminate that accusation through Defendant Hill's media platform.

371. The purpose of this agreement was to cast Plaintiff in a false and defamatory light before a large audience and generate public attention and engagement through sensational accusations involving Plaintiff's private family tragedy.

372. On or about December 5, 2025, Defendants took overt steps in furtherance of this agreement when Defendant Hill hosted and published an online interview featuring Defendant Julie McKnight and Defendant BK McKnight.

373. During that interview, Defendants Julie McKnight and BK McKnight repeated and reinforced the accusation that Plaintiff refused to communicate with his son during his final illness, refused to tell him that he loved him and had abandoned them.

374. Defendant Hill controlled the platform, framing, and promotion of the broadcast and presented the accusations to viewers as credible and truthful rather than questioning or challenging them.

375. Through this coordinated broadcast, Defendants transformed a private family tragedy into widely disseminated public content portraying Plaintiff as a father who denied love to his dying child. Defendants also perpetuated false statements made back in 2019 by Defendant BK McKnight, and falsely represented that Plaintiff had expelled Defendant Julie McKnight and their children from his home.

376. Following publication of the broadcast, the accusations spread widely across digital media platforms and online commentary channels, reaching millions of viewers and readers.

377.   Defendants knew that Plaintiff resides in Georgia and that the reputational and economic harm resulting from these accusations would be felt most acutely there.

378.   Defendants' coordinated actions including planning the interview, repeating the accusations, promoting the broadcast, and continuing to allow the content to remain publicly accessible constitute overt acts in furtherance of their agreement.

379.   As a direct and proximate result of Defendants' conspiracy, Plaintiff has suffered substantial reputational harm, emotional distress, and economic injury.

**WHEREFORE**, Plaintiff demands judgment against Defendants Hill, Julie McKnight, and BK McKnight for:

- Compensatory damages in an amount to be determined at trial;

- General damages for injury to Plaintiff's reputation, standing in the community, and personal dignity;

- Special damages for the economic losses and disruption to Plaintiff's professional relationships and business opportunities caused by Defendants' coordinated misconduct;

- Punitive damages pursuant to O.C.G.A. § 51-12-5.1, in an amount sufficient to punish Defendants and deter similar malicious and coordinated conduct in the future;

- Attorneys' fees and costs of litigation as permitted by law;

- Pre- and post-judgment interest; and

- Such other and further relief as the Court deems just and proper.

## COUNT SEVEN

### Breach of Contract

### (Against Defendant Julie McKnight)

380.  Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

381.  On or about August 30, 2014, Plaintiff and Defendant Julie McKnight entered into a written contract, specifically a Settlement Agreement and Release (2014 Agreement) which resolved certain disputes then existing between Plaintiff and Defendant Julie McKnight.

382.  The 2014 Agreement is a valid and binding contract entered pursuant to the laws of the State of California and was supported by a valid exchange of consideration, including both mutual promises of performance and monetary consideration.

383.  The 2014 Agreement contains specific provisions prohibiting the disparagement of each of the parties thereto by the other party. Specifically, the 2014 Agreement provides, in relevant part:

> The Parties agree not to disparage, denigrate, discredit, or make negative comments about one another, or to encourage or induce others to do so, in any communications with third parties (including all forms of media) in any manner that has a natural tendency to injure the Parties or their business, business reputation, or personal reputation.

384. Through her many statements about Plaintiff, Defendant Julie McKnight has repeatedly breached the non-disparagement provision of the 2014 Agreement. More specifically, Defendant Julie McKnight has repeatedly made statements which have both a natural tendency and the purposeful effect of disparaging, denigrating, discrediting, and negatively portraying Plaintiff, such as but not limited to those statements detailed herein.

385. Further, Defendant Julie McKnight has encouraged and induced others to make public statements which disparage, denigrate, discredit, and negatively portray Plaintiff, such as but not limited to Defendants Hill, Kebe, and the New York Post (Page Six) whose publicly broadcasted platforms have been used by Defendant Julie McKnight to publicize statements concerning Plaintiff in direct violation of her contractual obligations under the 2014 Agreement.

386. As a direct result of Defendant Julie McKnight's breaches of the 2014 Agreement, Plaintiff has suffered substantial damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant Julie McKnight for:

- Compensatory damages in an amount to be determined at trial;

- General and consequential damages arising as a direct and proximate result from Defendant Julie McKnight's breaches of contract;

- Attorneys' fees and costs of litigation as permitted by law;

- Pre- and post-judgment interest; and

- Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## TRIAL COUNSEL DESIGNATION

Please be advised that Jennifer Liniado is hereby designated as Trial Counsel in the above matter.

Dated: April 21, 2026

By:   */s/ Jennifer Liniado*
Jennifer Liniado, Esq.
GA Bar No. 494011
CONTINUUM LEGAL GROUP, LLP
5605 Glenridge Drive - Suite 600
Atlanta, Georgia 30342
Tel: (770) 800-3518
Email: jliniado@ContinuumLG.com

Brian A. Williamson (pro hac vice
   admission pending)
Jessica Shapiro (pro hac vice
   admission pending)
CALLAGY LAW PC
Mack Cali Centre II
650 From Road – Suite 240
Paramus, New Jersey 07652
Tel: (201) 261-1700
Facsimile: (201) 549-8408
E-mail: bwilliamson@callagylaw.com
      jshapiro@callagylaw.com
*Attorneys for Plaintiffs*